534 So.2d 1385 (1988)
Mary STRAIN and James Alton Strain
v.
MITCHELL MANUFACTURING COMPANY, Rowley Company, Inc., ABC Insurance Co., XYZ Insurance Co.
No. CA 8973.
Court of Appeal of Louisiana, Fourth Circuit.
November 29, 1988.
Writ Denied February 17, 1989.
*1386 George H. Troxell, III, New Orleans, for plaintiffs/appellees.
Quentin F. Urquhart, Jr., Montgomery, Barnett, Brown, Read, Hammond and Mintz, New Orleans, for defendant/appellant Mitchell Mfg. Co., Inc.
Vincent Paciera, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for defendant/appellee Rowley Co., Inc.
Iddo Pittman, Jr., Hammond, for intervenor/appellee St. Tammany Parish School Bd.
Before GARRISON, BARRY and ARMSTRONG, JJ.
ARMSTRONG, Judge.
Defendant, Mitchell Manufacturing Co. ("Mitchell"), appeals the trial court judgment awarding plaintiff, Mary Strain ("Mary"), general damages, past lost wages, future loss wages and past medical expenses and awarding plaintiff, James Alton Strain ("James") damages for loss of consortium. Intervenor, St. Tammany Parish School Board ("School Board"), requests a modification of the trial court judgment to provide credit for future worker's compensation benefits, including weekly benefits, medical expenses and any other sums which might be due under Louisiana Worker's Compensation Law.
Mary Strain was injured while attempting to operate a spring loaded cafeteria table manufactured by Mitchell. Folding and storing the tables was a regular task under Mary's job description and she had been performing the task over a period of four years. Mary isolates her injury to a particular day when, together with a co-worker, she proceeded to fold and store the tables. Her co-worker, who had complained about feeling ill that day, failed to bear her share of the weight while lifting the table. They completed the lift with great effort. Soon after Mary experienced strain and burning to such a degree that she was forced to seek medical attention. Persistent pain and physical limitations render Mary virtually unemployable. Mary *1387 pursued a strict products liability cause of action at trial and the jury awarded her general damages and future loss wages, past medical expenses and future medical expenses. Her husband James received a verdict for loss of consortium. The trial judge reduced the award by the amount of future medical expenses because it was not supported by the evidence. The School Board was reimbursed for past weekly worker's compensation benefits, past medical expenses and past rehabilitation costs.
By its first assignment of error, Mitchell claims the jury erred in imposing liability on it under any theory of strict products liability recognized in the state as articulated by the Louisiana Supreme Court in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). In Halphen, the court specified four theories for products liability recovery. It is not necessary to plead any one of these theories according to Halphen, their only purpose being to determine whether the knowledge of danger in a product is material, relevant or admissible evidence. In order to recover from a manufacturer the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The four theories for products liability recovery outlined in Halphen are as follows: (1) unreasonably dangerous per se; (2) unreasonably dangerous in construction and composition; (3) unreasonably dangerous because of failure to warn about a danger inherent in the normal use of the product; and (4) unreasonably dangerous in design because (a) the danger outweighs the utility of the product, (b) alternative products are available to serve the same needs with less risk of harm, and (c) there are feasible ways to design the product with less harmful consequences.
In the present case, Mary did not elicit any one of the four Halphen theories in pursuing her case. However, on appeal, Mary concedes that to prove Mitchell's liability she relied on its failure to warn and that there was a feasible way to design the product with less harmful consequences. These are two theories in which Halphen dictates that it is admissible to show that a manufacturer could know of and feasibly avoid the danger. The Louisiana Supreme Court discussed what evidence is admissible to prove knowledge of the manufacturer when the injured party asserts that it had a duty to warn of the danger:
"A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user.... In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.... A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved."
And as to a more feasible design with less harmful consequences the Court wrote:
"In regard to the failure to use alternative products or designs, as in the duty to warn, the standard of knowledge, skill and care is that of an expert, including the duty to test, inspect, research and experiment commensurate with the danger."
The trial judge did allow Mary to introduce evidence to show that the manufacturer should have known of the danger with its product.
Testimony offered by Mitchell's expert in mechanical engineering, Andrew McPhate, established that the cafeteria tables weigh 315 pounds each. The force required to start the closing action in a two-person lift ranged between 35-50 pounds, depending on the coordination between the parties. When a single person was required to close the tables the force required to start the closing action ranged between 76-90 *1388 pounds. When questioned concerning failed or stalled lifts Mitchell's expert testified that the force required might be in excess of 100 pounds because in a stalled lift the individual is doing the equivalent of a strictly vertical lift. Failed or stalled lifts result when insufficient force is exerted to trigger the spring action. The spring action can be reactivated by setting the table down to a horizontal position. Mary's safety expert, Michael Frenzel, testified that the shock load to the back or to the body could be significant if the stalled lift results because ones' lifting partner did not lift their share of the weight.
It is Mr. Frenzel's opinion that 1) the force required to start the closing action is an excessive amount of weight for a person to lift, 2) any posture assumed to effectuate the lift is unsafe and 3) the operator should be properly warned, trained or instructed of the potential for stalled lifts and the physical damage they can cause. Mr. Frenzel relied on the standards of the National Institute of Safety and Health (NIOSH) to support his opinion that excessive force is required to lift the tables. The NIOSH standards are based on a formula by which one can determine the appropriate amount of weight for an individual to lift. Frenzel suggested that it was incumbent on Mitchell to look at the effort that was required to lift the table in light of the common occurrence of back injuries and the hazard that they represent. When a company designs or constructs a work method that requires lifting, it ought to look at exactly what it is requiring those persons to lift.
Mitchell's representative testified that the testing that was done on the cafeteria tables was limited to prototype testing to insure that everything worked satisfactorily. Also tests were made on torsion bars and torsion plugs, but he knew of no tests conducted in regard to the actual lifting. Mr. McPhate testified that it should be business practice for a manufacturer to do field surveys on its products, primarily when a new product is first ushered on to the market. He knew of no such field surveys conducted on Mitchell's cafeteria tables.
Concerning the correct lifting posture, Mr. Frenzel testified that as a part of his present job he trains school workers in lifting techniques. The correct lifting posture is to lift with the big muscles within the legs, so the knees should be bent and the back should be as straight as possible. The design of Mitchell's tables does not allow one to assume this posture. Mr. Frenzel's testimony, that this table's design prohibited the operator from assuming the correct position, was corroborated by cafeteria workers that perform the task of folding and storing the tables.
Finally Mr. Frenzel explained that the table required a warning label from a safety point of view. The strength necessary to lift the table can not be estimated simply by looking at the table. A label could be used to warn the operator of the amount of force required. It could also give the operator instructions on how to lift, the proper posture and technique. Also it should warn that in a team lift it is imperative that the lifting activity is precisely coordinated and what to do if one encounters a stalled lift.
Mr. McPhate was also questioned concerning warnings on the tables themselves. Failing a physical demonstration by a trained person at the worksite, Mr. McPhate felt that a videotape showing how the table should be operated was the best instruction that Mitchell could provide. Without dismissing the use of written instructions or a label with cartooned figures to illustrate the operation of the tables, McPhate argued that a dynamic medium is preferred. When asked whether Mitchell had a duty to warn operators of the table regarding the possibility of stalled lifts McPhate responded tht he would expect such a warning to be part of the instructions given to the operator, however, it would be something the worker would learn about very quickly if he was not informed.
*1389 We conclude that sufficient evidence was presented from which the jury could reasonably determine liability. The jury could reasonably find that either the product was defective because Mitchell failed to warn about inherent dangers or that there is a feasible way to design the product with less harmful consequences.
By its second assignment of error Mitchell urges that Mary's injury was caused by her poor judgment in completing the lift without the cooperation of her co-worker. In doing so Mitchel argues that Mary assumed the risk.
This assignment of error has no merit. Mary could not assume the risk of her injuries when she could not fully appreciate how much weight she was lifting and that the posture she was assuming in lifting the table was unsafe. We conclude she did not have a full awareness of the danger she subjected herself to. In Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166 (La.1985), the court commented on the application of comparative fault to strict products liability situations:
"Where the threat of a reduction in recovery will provide consumers with an incentive to use a product carefully, without exacting an inordinate sacrifice of other interests, comparative principles should be applied for the sake of accident prevention."
Had there been a finding that Mary was negligent the causal effect of her injury nevertheless stems from Mitchell's defective product. Therefore we would not further any purposes in reducing her recovery.
Mitchell's final assignment of error concerns the testimony of Mary's expert witness in safety, Michael Frenzel. Mitchell argues that Frenzel lacks a background in mechanical engineering or ergonomics or specific knowledge of folding tables.
Frenzel was accepted as a general safety expert. He tested the Mitchell cafeteria tables at the work site and his testimony was based on the findings made in those tests. During the course of Frenzel's testimony attorney for Mitchell objected several times as to the scope and relevance of his testimony. These objections were overruled and from our review of the record we do not find that Frenzel's testimony was irrelevant or outside the area of his expertise. The trial judge concluded that Frenzel's opinions regarding the design of the table should be heard by the jury and that ultimately it was up to the jury to decide and to evaluate the opinion of any expert. We find no clear error. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Mitchell specifically takes issue with Frenzel's reliance on the NIOSH standards to show that the force necessary to lift the table was excessive. These standards were compiled in reference to static lifting but Mitchell concedes that they can serve as a guideline for administrative controls such as appropriateness of object design, whether training is needed for lifting, and proper lifting posture. The jury heard Frenzel's testimony that the standards were relative to static as opposed to dynamic lifting. They were free to evaluate it along with all the other evidence presented by the parties.
The School Board requests a modification of the judgment to provide credit for future worker's compensation benefits. The law supports a request for future worker's compensation benefits under these circumstances. Under La.R.S. 23:1103 a compensation carrier is entitled to be reimbursed all it has actually paid out to the injured party as of the date the judgment becomes final. The excess of the award is paid to the injured party. Thereafter, the compensation carrier should be given a credit on all sums it may come to owe in the future to, or on behalf of, the injured party up to the extent of payment of the tort recovery to the injured party. Until this excess is exhausted, the carrier should be obligated to make no further compensation payments or medical benefits. *1390 After exhaustion of the excess, if further compensation payments or benefits should become due, the carrier should then become obligated to resume payments. Billeaud v. United States Fidelity & Guar. Co., 349 So.2d 1379 (La.App. 3rd Cir.1977).
Mary argues that if the School Board is entitled to a credit for future medical payments due under the law then the jury award for future medical expenses should be reinstated. Cases subsequent to Billeaud have refused to follow its holding as to medical benefits therefore, the School Board is not entitled to a credit for future medical expenses.
The Supreme Court ruled on this issue in Fontenot v. Hanover Ins. Co. 385 So.2d 238 (La.1980). In Fontenot a worker's compensation insurer sought reimbursement for medical expenses paid out of an employee's judgment for damages for her pain and suffering. The Supreme Court wrote:
"The underlying policy of the worker's compensation statute provisions for apportionment of damages between employer and employee in suits against third persons merely prevents an employee's double recovery for his injuries; it does not require an employee to reimburse out of his award for pain and suffering medical expenses which he failed to recover from a third party tortfeasor."
The distinction between weekly worker's compensation benefits and medical expenses was drawn in Brooks v. Chicola, 503 So.2d 1086 (La.App. 3 Cir.1987).
"Unlike medical expenses, weekly worker's compensation benefits are paid, in part at least, in lieu of recovery for pain and suffering. If plaintiff was not required to reimburse intervenors out of the sum he recovered for pain and suffering, he would be receiving double recovery, at least insofar as weekly benefits are paid to compensate for pain and suffering. The possibility of double recovery is avoided only if the intervenor may seek reimbursement of weekly benefits out of an employee's award for pain and suffering."
Applying this thinking the court in Chicola amended the trial court judgment to award the worker's compensation insurer a credit on all weekly compensation benefits it may come to owe in the future to, or on behalf of the plaintiff equal to the amount of plaintiff's tort recovery, less the amount reimbursed to intervenors until this excess is exhausted. However the workers compensation insurer remained liable for future medical benefits and received no credit.
For the foregoing reasons we amend the judgment in the instant case to read as follows: IT IS FURTHER ORDERED, ADJUDGED AND DECREED that such portion of the amount of the judgment herein in favor of plaintiff, Mary Strain which exceeds the amount which intervenor, St. Tammany Parish School Board, is entitled to be paid shall be credited against any obligation which St. Tammany Parish School Board may owe to Mary Strain for future worker's compensation benefits after the date of the satisfaction of this judgment.
AMENDED AND AFFIRMED, AS AMENDED.
BARRY, J., dissents with reasons.
BARRY, Judge, dissenting with reasons.
I fail to find by a preponderance of the evidence that there was a defect in the Mitchell table which made it unreasonably dangerous to normal usage and/or that the defect caused harm. Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971).
The plaintiff did not prove that the table was unreasonably dangerous per se or that there was a defect in the construction or composition of the table. Hence, it follows that there was no need to warn of a danger. The other criteria of Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986) are immaterial.
*1391 The facts show that the plaintiff had worked with this table for years and was thoroughly familiar with its operation. As such, she assumed any risk which could result. Using a cause-in-fact analysis, I have to conclude that the plaintiff's injury was caused as a result of her co-worker's failure.
This is a classic "accident" that falls within the purview of our worker's compensation statutes.